# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| | : | |
| WILLIAM MARK MCCULLY, | : | Bankruptcy No. 08-16370DWS |
| | : | |
| Debtor. | : | |

## MEMORANDUM OPINION

**BY: DIANE WEISS SIGMUND, United States Bankruptcy Judge**

Before the Court is the Motion to Dismiss Case for Abuse Pursuant to 11 U.S.C. § 707(b)(3) (the "Motion") filed by the United States trustee ("UST"). The UST contends that the contributions that debtor William McCully ("Debtor") makes to retirement savings and self-repayment of a retirement loan account, when coupled with his excess disposable income, demonstrate the availability of funds to pay a substantial portion of his debts in a Chapter 13 plan. This, she avers, is substantial abuse requiring dismissal of this Chapter 7 case.

**BACKGROUND**

On September 30, 2008 Debtor filed a Chapter 7 petition accompanied by his Schedules, Statement of Affairs and Certificate of Credit Counseling. Exhibit T-1.

His Chapter 7 Statement of Current Monthly Income and Means Test Calculation filed contemporaneously declared that his family income was below median for a like household in Pennsylvania and that a presumption of abuse under the means test of § 707(b)(2) did not arise. Doc. No. 3.[1] The UST does not challenge these conclusions. Rather the focus of this contested matter is the Debtor's potential disposable income as reflected on Schedules I and J.

The Debtor is married and the sole support of a 10-year old son from his first marriage which ended in March 2006 and a sixteen month daughter from his remarriage in May 2007 to his present wife, all of whom are living with him.[2] He has been employed for thirteen years as an engineer with Case New Holland Inc. (CNH), and earned an annual salary of $72,914 in 2006 and 2007. He filed this Chapter 7 case to discharge $62,431 of unsecured debt, principally to credit card companies, medical providers and utilities. He owns no real property. His assets, valued at $161,120.76, consist principally

---

[1] I shall take judicial notice of the docket entries in this case. Fed.R.Evid. 201, incorporated in these proceedings by Fed.R.Bankr.P. 9017. See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1200 n.3 (3d Cir. 1991). While a court may not take judicial notice *sua sponte* of facts contained in the debtor's file that are disputed, In re Augenbaugh, 125 F.2d 887 (3d Cir. 1942), it may take judicial notice of adjudicative facts "not subject to reasonable dispute ... [and] so long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority." In re Indian Palms Assoc., 61 F.3d 197, 205 (3d Cir. 1995) (*citing* Fed.R.Evid. 201(f) advisory committee note (1972 proposed rules). Moreover, "factual assertions in pleadings, which have not been superceded by amended pleadings, are judicial admissions against the party that made them. Larson v. Gross Bank, 204 B.R. 500, 502 (W.D. Tex. 1996).

[2] His wife, age 25, does not work.

-2-

of his Fidelity (CNH) Retirement Savings Plan ("Savings Plan") that had a balance of $143,566.40 as of September 12, 2008.[3]  Exhibit T-1.

As the UST points out, Debtor's originally filed Schedule I reflected income of $3,561.30 after payroll deductions of $1,659.64, exclusive of taxes. Specifically noted are a monthly pension loan repayment of $481.05 and a monthly retirement savings plan contribution of $603.98. The companion Schedule J listed monthly expenses of $3,286.00 resulting in $275.30 of monthly disposable income. Id. On October 27, 2008 the Motion was filed based on these Schedules. Doc. No. 12. On November 11, 2008 the Debtor filed an amended Schedule J and Amended Summaries. Doc. No. 17. The amended documents evidence an increase in the Debtor's expenses from $3,286.00 to $3,881.00. According to the amendment, the Debtor now has negative disposable income of $319.70. Exhibit T-3.

The Debtor was examined about the almost $600 swing in his expenses from positive $275.30 to negative $319.70. He acknowledged that the amendment was prompted by the Motion, stating that he knew he did not have excess income of $275 at the end of the month as the Motion averred (and his original Schedules reflected). Why he did not make that same observation when he signed his Schedules under penalty of perjury was not explained. In any event, the Motion caused him to revisit his expenses working from his checkbook rather than from the form Schedule J which he contends caused him to

---

[3] Presumably this amount has decreased by reason of the substantial decline in the stock market since that date.

miss some of his expenses.[4] Thus, for example, he now has scheduled a monthly "other" expense of $403 rather than $194 consisting, <u>inter alia</u>, of new expenses of $37 for family events (funeral), $95 for gifts, $40 for books for his sixteen-month old daughter and $155 of cash (miscellaneous). These are past annual expenses that he has prorated into his monthly budget. His monthly cable/internet/telephone expense increased from $217 to $495, the high amount of which he attributes to telephone calls made by his wife to her mother in Jamaica. There are also across the board increases of at least 5% in most of the other form categories.

As noted, Debtor had a balance in his Savings Plan as of September 12, 2008 of $143,566.40. The account continues to grow by reason of his $603.98 monthly contribution through a wage deduction. In addition, Debtor has two outstanding loans against the Savings Plan: one has five years remaining whereas the other will be paid off in July 2009. Loan repayments of $191.43 are made every other week with respect to the latter and imminently maturing loan.

Debtor explained that his financial problems arose during his prior marriage. From 1996 to 1998 uninsured medical expenses of $20,000 were incurred in an ultimately

---

[4] To demonstrate that he went through his checkbook to prepare his amended Schedule J, the Debtor produced a copy of his checking account statements for the past twelve months notated with the nature of the expense for which each check was written. How Debtor then used the information on Exhibit D-4 to prepare amended Schedule J is not apparent nor explained.

successful effort to become pregnant.[5] In addition, he states that his ex-wife Cassandra had a substance abuse problem and drained their bank account, which required him to use credit cards to pay for the family's basic needs. In June 2000 he and Cassandra entered debt counseling with Consumer Credit of the Quad Cities, undertaking a plan to repay seven credit cards aggregating $46,949.76. Exhibit D-1. The agreement required monthly payments of $916 which continued to increase with time.[6] However, he made those payments, albeit with irregularity, for 3-1/2 years. Exhibit D-2. When he left the program at the end of 2004, he still owed $30,000 but he could not afford to continue with the monthly payments, then at $980 and about to increase to over $1,000.

**DISCUSSION**

> The UST invokes § 707(b)(3) which provides:
>
> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider-
>
> > (A) whether the debtor filed the petition in bad faith; or
> >
> > (B) the totality of the circumstances ... of the debtor's financial situation demonstrates abuse.

---

[5] The medical expenses reflected on Schedule F are principally obligations to Lancaster General Hospital arising in July 2008, and are unrelated to the 1998 uninsured medical expenses to which he referred.

[6] While stating that on the projected payment schedule it would take 55 months to pay off the principal indebtedness alone, the agreement nonetheless terminated the earlier of three years or when the debt was paid off. Id.

She does not allege that Debtor has filed in bad faith, but rather relies upon subsection (B), i.e., the totality of circumstances of Debtor's financial situation. In applying that test, I am guided by the cases construing the pre-BAPCPA version of § 707(b). In those cases, the statutory vacuum as to the definition of substantial abuse was filled with a "totality of the circumstances" test that looked at, inter alia, ability to pay. In re Lenton, 358 B.R. 651, 662-63 (Bankr. E.D. Pa. 2006) (citing cases). Thus, I will address the UST's argument that Debtor pension related deductions from income and his excessive expenses are abusive as they evidence an ability to pay creditors under a Chapter 13 plan which Debtor impermissibly avoids by this Chapter 7 case.

As argued by the UST, while pension contributions and pension loan repayments are insulated in Chapter 13, the same protection does not apply in Chapter 7, presumably for the purpose of the means test. While that may be true, it seems counterintuitive to deprive a debtor of a Chapter 7 discharge because he has funds being used for pension payments when those funds would not be available to pay creditors in a Chapter 13 case. By the same token, if the Debtor has sufficient funds to deposit $600 per month towards his pension, it is inconceivable that his expenses exceed his income by over $300 as his amended Schedules now attest. In short, I simply do not find his amended Schedule J credible. When asked how he is funding this shortfall, he replied "from his checking account," which did not answer the question. He then stated that he would cut costs by reducing the voluntary contribution

to his pension plan.[7]  If these are truly the family's expenses, they evidence excessive spending that is inconsistent with a debtor seeking the benefits of bankruptcy.  For Debtor to avoid payment of his creditors while spending, for example, $40 per month on books for a baby, $495 monthly for cable/internet/telephone and $95 for gifts is abusive.  It reflects a lack of comprehension of the careful balance between debtor protection and creditor rights that Congress embodied in the bankruptcy law.

I agree with the UST that this Debtor could easily propose a Chapter 13 plan that would provide meaningful payments to his creditors.  He carried out a debt repayment plan for almost 4 years in the early 2000's.  While that plan at close to $1,000 per month ultimately choked him, there is obviously a plan somewhere between zero and $1,000 that will not.  Moreover in June of this year, his larger pension loan repayment will be completed, making almost $400 additional monthly income available for payment to his creditors under a Chapter 13 plan.[8]

I understand that the circumstances by which the Debtor incurred his substantial unsecured debt do not evidence reckless spending by the Debtor himself and that he made

---

[7] He correctly noted that adding back $600 would not increase his available income by that amount since taxes, presently deferred, would be incurred on that income.

[8] The Debtor introduced the Summary Plan description of the Savings Plan, Exhibit D-3, but neither he nor the UST has taken a position as to whether the loan repayments are mandatory. For the purposes of this contested matter, I need go no further than conclude that one of the two loans made under that Plan will be repaid shortly and the allocated funds will be available for payments to creditors. As noted by the UST, the terms of a Chapter 13 plan to be filed by the Debtor should he convert will be examined by the Chapter 13 trustee and creditors. While arguing that this Chapter 7 case is abusive, the UST does not, nor will I, seek to prescribe what that plan should be.

a significant and serious effort to repay his creditors prior to resorting to bankruptcy. However, his present budget, if to be believed, and his present attempts to address his financial situation are clearly not his best effort or even an honest and sincere effort to repay his creditors. As such, I must conclude that the totality of the circumstances of the debtor's financial situation demonstrates abuse. Because I am convinced that the Debtor has a true need for bankruptcy relief, I will grant the Motion and dismiss this case in 15 days only if the Debtor fails to convert to Chapter 13 before that time.

An Order consistent with this Memorandum Opinion shall be entered.

*Diane W. Sigmund*

DIANE WEISS SIGMUND
U.S. Bankruptcy Judge

December 15, 2008